IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| VICKY S. CRAWFORD, )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>THE METROPOLITAN GOVERNMENT OF )<br>NASHVILLE AND DAVIDSON COUNTY, )<br>TENNESSEE, )<br>)<br>    Defendant. ) | No. 3-03-0996<br>Judge Campbell<br>Magistrate Judge Brown |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>
[Fed. R. Civ. Proc. 56; Local Rule 56.01(a)]**

This case has been to the United States Supreme Court and back, but one thing is unchanged – the Metropolitan Government did not retaliate against Plaintiff Vicky Crawford. To the contrary, Chris Henson – who was not accused of anything untoward and was not even involved in the internal investigation at issue – terminated Plaintiff's employment because the Board of Education's Payroll Division, which Plaintiff supervised, was in total disarray. As explained in detail below, Plaintiff wholly failed to perform her duties as Payroll Coordinator, and that is why she was fired, not because she provided information during an in-house sexual harassment investigation.

Specifically, Plaintiff's retaliation claim fails for three reasons. First, Plaintiff's claim fails because she cannot establish the second element of a prima facie case of retaliation – she cannot show that the decisionmaker in this case, Chris Henson, knew about her protected activity. Second, Plaintiff's claim fails because she cannot establish the fourth element of a prima facie case of retaliation – she cannot show a causal connection between her protected activity and Mr. Henson's decision to suspend, and later terminate, her employment. Finally,

Plaintiff's claim fails because, even if she could establish a prima facie case of retaliation, she has no evidence that Mr. Henson's legitimate, non-discriminatory reasons for suspending, and later terminating, her employment are a pretext for retaliation.

For these reasons, and as set forth in more detail below, the Metropolitan Government respectfully requests that this Court dismiss Plaintiff's retaliation claim with prejudice.

## I. FACTUAL BACKGROUND

### A. Plaintiff's Involvement in the Human Resources Department's In-House Sexual Harassment Investigation

Plaintiff worked for the Metropolitan Board of Education in various capacities from 1974 to 2003. Exhibit "A", Complaint, ¶ 6; Exhibit "B", Crawford Depo. 5:7-6:7.[1] During the relevant timeframe, Plaintiff was the Payroll Coordinator in the Board's business office. Exhibit "A", Complaint, ¶ 6; Exhibit "B", Crawford Depo. 5:7-6:7.

In late May 2002, the school system initiated an in-house investigation into allegations that Gene Hughes, the former Director of the Board's Employee Relations Division, had sexually harassed a coworker. Exhibit "A", Complaint, ¶¶ 9-10. On July 22, 2002, Veronica Frazier and Delaine Linville, investigators with the Metropolitan Government's Human Resources Department, interviewed Plaintiff about Mr. Hughes's alleged inappropriate behavior. Exhibit "A", Complaint, ¶ 11; Exhibit "B", Crawford Depo. 19:2-20:7. Plaintiff reported to Ms. Frazier and Ms. Linville that Mr. Hughes had acted inappropriately toward her. Exhibit "A", Complaint, ¶ 12.

At the conclusion of her investigation, Ms. Frazier issued a Fact-Finding Report summarizing her conclusions. Exhibit "C", Garcia Depo. 127:23-129:10 (Ex. 5 to Garcia

---

[1] The exhibits referenced herein are the exhibits attached to the Metropolitan Government's concise statement of material facts for which there is no genuine issue for trial, which is being filed contemporaneously herewith.

Depo.). In this Report, which was issue on September 13, 2002, Ms. Frazier concluded that Mr. Hughes had engaged in inappropriate and unprofessional behavior, but that there was insufficient evidence to sustain a claim of sexual harassment. *Id.*

### B. The Board's Discovery That the Payroll Division, Which Was Run by Plaintiff, Had Significant Problems

At the conclusion of her investigation, Ms. Frazier also sent a letter to Kim McDoniel, the Internal Audit Manager for the Metropolitan Government's Department of Finance. In her letter, Ms. Frazier informed Ms. McDoniel about concerns related to the Board's Payroll Division. Exhibit "D", McDoniel Depo. at 21:1-22:8. Additionally, during the fall of 2002, auditors from the accounting firm KPMG, who were on-site at the school administration building performing their annual audit, also began noticing "operational irregularities" in the Payroll Division. Exhibit "E", Henson Depo. 43:11-46:6. For example, the KPMG auditors noted that certain employees' garnishments were not being paid into the court system, employee annuity payments were not being made to the appropriate vendors, and IRS forms were not being timely or accurately completed. *Id.*

Ms. McDoniel, who did not know Mr. Hughes, decided to authorize KPMG to bring in "a forensics person" to investigate the Payroll Division. Exhibit "E", Henson Depo. 50:17-22; Exhibit "D", McDoniel Depo. 20:14-15.

### C. KPMG'S Investigation and Its Conclusion That the Payroll Division Had Significant Problems

Joe Sullivan, a forensic accountant in KPMG's Atlanta office, came to Nashville during the last week of October and the first two weeks of November of 2002 to examine the Payroll Division's operations. Exhibit "F", Transcript of February 6, 2003 Hearing, 12:5-18, 48:15-21. He stayed three to four days per week during that period. *Id.*

Mr. Sullivan was not told that Plaintiff was the cause of the Payroll Division's problems. Exhibit "G", Sullivan Depo. 211:15-22. He was not asked specifically to investigate Plaintiff. *Id.* at 196-14-18. To the contrary, Mr. Sullivan was asked generally to investigate the apparent operational irregularities in the Payroll Division. *Id.*

As part of his investigation, Mr. Sullivan worked at the school's administrative office for about a week interviewing people and reviewing documents. Exhibit "F", Transcript of February 6, 2003 Hearing at 34:20-36:4. Then Mr. Sullivan was allowed into Ms. Crawford's private office, where he discovered a number of original documents, including original checks payable from outside vendors to the government, checks from the government to outside vendors, checks to the government from individuals, and checks from the government to individual employees. Exhibit "F", Transcript of February 6, 2003 Hearing at 16-31; *see also* Exhibits to Exhibit "F."

Mr. Sullivan described Ms. Crawford's office as follows:

> Well, I can truthfully remember that Ms. Crawford's office was, I think in my words just a mess, totally disorganized. I mean, literally I don't remember seeing an office comparable to that in any other business.
>
> She – you could not see her desk. I mean, there were just piles of paper, I would say a foot, two feet high all over her desk. Strewn on the floor, in chairs, papers on bookcases.

Exhibit "G", Sullivan Depo. 201:17-25. With respect to the uncashed checks in Ms. Crawford's office, Mr. Sullivan stated:

> Q. And then I guess at some point you and/or your team went through some of these stacks and found some checks that either hadn't been mailed out or hadn't been cashed?
>
> A. Correct.
>
> Q. And was there any sort of – was there sort of like a file that had uncashed checks or voided checks? Or where did you find these checks?
>
> A. No, absolutely not. It was just – I might have found, you know, a check under a pile of various papers. And then there might have been across the room on the

bookcase the letter from a vendor saying, well, you haven't cashed my check. And I was just, you know, taking a look at that check. And then seeing the letter and trying to marry the two together. But there was no filing system at all. There was no organization. It was just totally, you know, a mess.

*Id.* at 202:5-22.

Against this backdrop, Plaintiff was placed on administrative leave on November 6, 2002. Exhibit "B", Crawford Depo. 24:6-8. Chris Henson, the Board's Assistant Superintendent for Business and Facilities Services, decided to suspend Plaintiff out of concern that evidence may be destroyed before Mr. Sullivan completed his investigation. Exhibit "E", Henson Depo. 65:20-66:5.

It is significant to note that Mr. Henson was new to the Board of Education, having been hired on July 1, 2002, roughly two and a half months before Ms. Frazier issued her Fact-Finding Report. Exhibit "E", Henson Depo. 7:16-24. Mr. Henson was not acquainted with Gene Hughes before coming to work for the school system. *Id.* at 18:5-9. Furthermore, even after Mr. Henson arrived, he had very little interaction with Mr. Hughes. *Id.* at 23:7-9. And while Mr. Henson had heard that there was an allegation that Mr. Hughes had engaged in inappropriate behavior, he had no input into the investigation, and he was not kept abreast of the status of the investigation. *Id.* at 23:11-20. In fact, Mr. Henson did not even know whether employees from his department were being interviewed. *Id.*

On one of Mr. Henson's first days on the job, he remembers receiving a phone call from the IRS about tax forms not being filed properly. Exhibit "E", Henson Depo. at 96. Mr. Henson received a number of complaints from employees, vendors, and the IRS about Payroll issues. *Id.* at 97-98. In fact, in early September 2002, Ms. Crawford's three subordinates came to Mr. Henson to report problems in the Payroll Division. *Id.* at 44:15-23.

### D. Chris Henson, Who Was Not Involved in the Investigation of Mr. Hughes, Terminated Plaintiff's Employment

On November 22, 2002, Mr. Sullivan met with Mr. Henson, Ms. McDoniel, attorneys from the Department of Law, and Eileen McGinn of KPMG. Exhibit "E", Henson Depo. at 55-57. Mr. Sullivan explained that, while there was no evidence of criminal activity, there were a number of operational irregularities in the Payroll Division. *Id.* at 57:4-7. In sum, Mr. Sullivan concluded that the Payroll Division "absolutely" had "significant problems." Exhibit "G", Sullivan Depo. 207:5-9. Furthermore, the problems in the Payroll Division were attributable to Ms. Crawford, supervisor of that Division. *Id.* at 207:10-208:15.

On December 4, 2002, Mr. Henson prepared and sent a charge letter to Plaintiff. Exhibit "E", Henson Depo. 57:4-7. In his December 4th letter, Mr. Henson outlined the documents plaintiff was charged with mishandling. Exhibit "F", Transcript of February 6, 2003 Hearing (Ex. 1 to Hearing).

On December 12, 2002, Mr. Henson conducted a disciplinary hearing, during which Plaintiff was given an opportunity to address the issues set forth in Mr. Henson's December 4, 2002 letter. *Plaintiff, however, chose not to testify on her own behalf.* Exhibit "H", Transcript of December 12, 2002 Hearing.

On January 6, 2003, Mr. Henson wrote Plaintiff a letter terminating her employment. Exhibit "F", Transcript of February 6, 2003 Hearing (Ex. 2 to Transcript); Exhibit "E", Henson Depo. (Exhibit 2 to Henson Depo.), 112:22-113:2, 114:25-115:3. Mr. Henson concluded that Plaintiff had failed to perform her duties as Payroll Coordinator, and because of the seriousness of her offenses, he was terminating her employment. Exhibit "F", Transcript of February 6, 2003 Hearing (Ex. 2 to Transcript).

Plaintiff appealed Mr. Henson's decision to the Director of Schools, Pedro Garcia. On February 6, 2003, Dr. Garcia conducted a five-hour hearing to consider Plaintiff's appeal. Exhibit "F", Transcript of February 6, 2003 Hearing. Mr. Sullivan testified, as did Mr. Henson, and two other witnesses for the government. This time Plaintiff testified on her own behalf. She admitted that she had repeatedly been counseled about her problem with timeliness over the years. *Id.* at 188. But she denied responsibility for every single item she was charged with mishandling, blaming her subordinates for the mishandling of checks. Alternatively, she asserted that the original checks that she had been charged with mishandling had been "planted" in her office by someone with sinister intent. *Id.* at 190 – 93.

After hearing all of the evidence and argument, Dr. Garcia upheld Mr. Henson's decision to terminate Plaintiff's employment. Exhibit "I", March 31, 2003 Decision Letter. Dr. Garcia's findings are set forth in a 13-page letter, which Dr. Garcia sent to Plaintiff on March 31, 2003. *Id.* In his March 31st letter, Dr. Garcia summarized the evidence and testimony adduced at the hearing, concluding that Plaintiff exhibited a severe lack of knowledge about the sensitive documents in her office and offered little or no explanation about how the documents there, or how they should have been handled once they got there. *Id.* at 12.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is intended to "isolate and dispose of factually unsupported claims or defenses." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The party seeking summary judgment bares the initial burden of demonstrating that an essential element of the non-moving party's case is lacking. *See Celotex*, 477 U.S. at 323. When the moving party meets this burden, the burden then shifts to the non-moving party who must produce specific evidence to establish a genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Although the Court must view all facts and inferences to be drawn in the light most favorable to the non-moving party, the non-moving party may not merely rest on conclusory allegations contained in the complaint, but must respond with affirmative evidence supporting its claims and establishing the existence of a genuine issue of material fact. *See SEC v. Blavin*, 760 F.2d 706 (6th Cir. 1985); *Celotex*, 477 U.S. at 324.

Where, as here, the undisputed facts warrant summary judgment, justice is best served by entering summary judgment. For this reason, the United States Supreme Court has emphasized summary judgment as a proper procedure to promote judicial economy and reduce litigation costs. *See Celotex*, 477 U.S. at 327; *Matsushita Electric Industrial Co., Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It is "regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex*, 477 U.S. at 327.

## III. LEGAL ANALYSIS

Plaintiff has one remaining claim – a retaliation claim under Title VII of the Civil Rights Act of 1964.[2] As discussed below, that claim fails as a matter of law.

---

[2] By way of its Order initially granting the Metropolitan Government summary judgment, the Court (1) dismissed plaintiff's retaliation claims under Title VII and the Tennessee Human Rights Act, and (2) declined to exercise supplemental jurisdiction over Plaintiff's common law retaliation claim and her claim under the Whistleblower Act. When Plaintiff appealed the Court's Order granting the Metropolitan Government summary judgment, she did not raise the Court's dismissal of her THRA claim. Thus, that claim is not before the Court. Similarly, Plaintiff did not appeal dismissal of her common law retaliation claim or her Whistleblower Act claim, and thus, those claims are not before the Court.

### 1. Elements of a Title VII Retaliation Claim

To establish a *prima facie* case of retaliation, "the plaintiff must show that: (1) she engaged in activity protected under Title VII; (2) the defendant knew that she engaged in the protected activity; (3) the defendant subsequently took an adverse, retaliatory action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) the protected activity and the adverse action were causally connected." *Randolph v. Ohio Department of Youth Services*, 453 F.3d 724, 736 (6th Cir. 2006). However, "[n]ot every act affecting an individual's employment can be considered an adverse, retaliatory action giving rise to liability." *Id.* (*citing Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998)). Instead, to support a Title VII claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Sante Fe Railroad v. White*, 126 S. Ct. 2405, 2414 (2006) (internal quotation omitted).

If plaintiff can establish a *prima facie* case, the burden shifts to the Metropolitan Government to articulate a legitimate, non-discriminatory reason for any retaliatory action. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Plaintiff then must show that the Metropolitan Government's articulated reason is a pretext for illegal discrimination. *See Allen v. Michigan Dept. of Corrections*, 165 F.3d 405, 409 (6th Cir. 1999).

In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U. S. 133 (2000), the Supreme Court expanded on the burden that a plaintiff must meet under the McDonnell Douglas burden-shifting analysis, holding that "in appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory

purpose." *Id.* at 147. The Court acknowledged, however, that establishing a *prima facie* case is not sufficient in and of itself to avoid summary judgment, stating:

> [T]here will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Id.* at 148.

### 2. Plaintiff's Claim Fails Because She Cannot Establish the Second Element of Her Prima Facie Case – She Cannot Show That Chris Henson Knew About Her Protected Activity

To establish a prima facie case of retaliation, Plaintiff must show that "the defendant knew that she engaged in the protected activity . . . ." *Randolph*, 453 F.3d at 736. In this case, Plaintiff cannot make such a showing, because she has no evidence that Chris Henson knew what she communicated to Ms. Frazier or Ms. Linville. Because Plaintiff cannot make such a showing, she cannot establish the second element of a prima facie case of retaliation, and thus, her claim fails as a matter of law.

During his deposition, Mr. Henson testified that, while he had heard that there was an allegation that Mr. Hughes had engaged in inappropriate behavior, he had no input into the investigation, and he was not kept abreast of the status of the investigation. *Id.* at 23:11-20. Mr. Henson did not even know whether employees from his department were being interviewed. *Id.* In fact, the first time Mr. Henson saw a copy of Ms. Frazier's September 13, 2002 Fact-Finding report was on December 12, 2002, when Plaintiff's counsel handed it to him at the end of Ms. Crawford's disciplinary hearing. *Id.* at 16 – 17. In short, Mr. Henson had virtually no knowledge about the investigation of Mr. Hughes. *Id.* at 28:14-17.

Moreover, Plaintiff has no evidence to rebut Mr. Henson's testimony. Under plaintiff's theory, either Veronica Frazier or Delaine Linville must have told Mr. Henson and/or Dr. Garcia what Plaintiff told them about Hughes's behavior. During her deposition, however, Plaintiff admitted that she does not know if there was ever any such discussion. Exhibit "B", Crawford Depo. at 26:25-27:5. To the contrary, Plaintiff just "assumes" that Ms. Frazier or Ms. Linville must have told Mr. Henson and / or Dr. Garcia about the information she provided during her July 22, 2002 interview. Exhibit "B", Crawford Depo. at 26:9-15. But Plaintiff's unsupported conjecture is insufficient. As the Sixth Circuit has stated, a plaintiff must offer more than conspiracy theories, "flights of fancy, speculations, hunches, intuitions or rumors" to establish this element of a prima facie case. *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002).

Mr. Henson made the decision to terminate Plaintiff's employment. Plaintiff's retaliation claim fails because she cannot show that Mr. Henson "knew that she engaged in the protected activity . . . ." *Randolph*, 453 F.3d at 736. For this reason, Plaintiff's retaliation claim fails as a matter of law.[3]

---

[3] Mr. Henson made the decision to terminate Plaintiff's employment, and thus, it is his knowledge that is relevant. But Dr. Garcia was also unaware who the witnesses were in the Gene Hughes sexual harassment investigation until he read the Fact-Finding Report in September 2002. Garcia Depo. at 65. Furthermore, even after reading the report, Dr. Garcia did not know who the accusers were. *Id.* at 75-76, 125. The statements made by the witnesses are summarized, but no specific statements are attributed to any particular witness. Mr. Hughes told Dr. Garcia that he suspected Tamara Sadler and Plaintiff were the complaining parties, but that was speculation on Mr. Hughes's part. *Id.* at 76.

3. **Plaintiff's Claim Fails Because She Cannot Establish the Fourth Element of a Prima Facie Case of Retaliation – She Cannot Show a Causal Connection Between Her Protected Activity and Chris Henson's Decision to Terminate Her Employment**

To establish the element of causal connection, "the evidence must be sufficient to raise an inference that the protected activity was the likely reason for the adverse action." *Wade v. Knoxville Utilities Board*, 259 F.3d 452 (6th Cir. 2001). But "the mere fact that an adverse employment action occurs subsequent to the protected activity does not, standing alone, support an inference of retaliation." *Brown v. Chase Brass & Copper Co., Inc.*, 14 Fed.Appx. 482, 490 (6th Cir. 2001) (*citing Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986).

Plaintiff has no evidence that Mr. Henson's decision to suspend, and later terminate, her employment was motivated by the fact that she had engaged in protected activity. Mr. Henson was not accused of anything untoward, nor was he involved in the internal investigation during which Plaintiff reported inappropriate behavior. Moreover, KPMG's forensic investigation of the Payroll Division uncovered significant problems with the Payroll Division, problems that stemmed from Plaintiff's mismanagement. In short, KPMG's investigation breaks any connection between Plaintiff's protected activity and Mr. Henson's decision to suspend, and later terminate, her employment. For these reasons, plaintiff cannot show a causal connection between her protected activity and Mr. Henson's actions. Thus, she cannot establish the fourth element of a prima facie case, and for this additional reason, her claim fails as a matter of law.

4. **Plaintiff's Retaliation Claim Fails Because She Cannot Show That Chris Henson's Legitimate, Non-discriminatory Reasons for his Actions Are Pretextual**

Finally, even if Plaintiff could establish a prima facie case of retaliation, her claim fails because she cannot show that Mr. Henson's legitimate, non-discriminatory reasons for suspending, and later terminating, her employment are a pretext for retaliation. To establish

R:\L\L\L-13000+\L-13804\Pleadings\MSJ 2009\MSJ - MOL.doc     12

Case 3:03-cv-00996    Document 104    Filed 08/17/2009    Page 12 of 16

pretext, a plaintiff must show: (1) that the proffered reason had no basis in fact; (2) that the proffered reason did not actually motivate the actions; or (3) that the proffered reason was insufficient to motivate the actions. *See Hopkins v. Electronic Data Systems Corp.*, 196 F.3d 655, 662 (6th Cir. 1999). Plaintiff cannot make such a showing. Accordingly, for this additional reason, Plaintiff's retaliation claim fails as a matter of law.

The Metropolitan Government invites the Court to consider the circumstances that led to KPMG's forensics unit being hired to investigate the Board of Education's Payroll Division. On July 1, 2002, Chris Henson was hired as the Board's new Assistant Superintendent for Business and Facilities Services. From his first days on the job, Mr. Henson was getting complaints from employees, vendors, and the IRS, all of which pointed to problems in the Payroll Division. Plaintiff's three subordinates approached Mr. Henson with complaints about how Plaintiff was running her office. The KPMG accountants who were already onsite conducting an annual audit indicated to Kim McDoniel that they were uncovering problems in the Payroll Division. Finally, upon completion of her investigation, Veronica Frazier wrote a letter to Kim McDoniel, informing Ms. McDoniel that there appeared to be problems with the Payroll Division.

All of these sources of information were converging on Mr. Henson during the fall of 2002. And they all pointed to one thing – that there were significant problems in the Payroll Division. Moreover, once KPMG's forensics unit began its investigation, it did not take long to unearth fundamental problems with the way Plaintiff was performing (or not performing) her job. Plaintiff's office was, literally, unlike anything KPMG's investigator, Joe Sullivan, had ever seen. Sullivan Depo. 201:17-25. ("I mean, literally I don't remember seeing an office comparable to that in any other business.").

R:\L\L\L-13000+\L-13804\Pleadings\MSJ 2009\MSJ - MOL.doc  13
Case 3:03-cv-00996   Document 104   Filed 08/17/2009   Page 13 of 16

At the conclusion of his investigation, Mr. Sullivan informed the Board that, while there was no evidence of criminal activity, there were a number of operational irregularities in the Payroll Division. Henson Depo. at 57:4-7. In short, the Payroll Division had "significant problems." Sullivan Depo. 207:5-9. And those problems were attributable to Plaintiff. *Id.* at 207:10-208:15. Furthermore, after she was charged with misconduct, Plaintiff was given an opportunity to explain her side of the story, but *she chose not to testify on her own behalf.* She gave Mr. Henson no explanation for the problems that were plaguing the Payroll Division.

In the face of this overwhelming evidence that Plaintiff had mismanaged the Payroll Division, and with no explanation from Plaintiff, there was only one reasonable choice for Mr. Henson to make – that Plaintiff's employment should be terminated for poor performance. That is what Mr. Henson did, and Plaintiff has no proof that Mr. Henson's legitimate, non-discriminatory reasons for his actions are a pretext for retaliation.

Similarly, Plaintiff cannot show that Dr. Garcia's actions were retaliatory. During her February 6, 2003 appeal hearing, Plaintiff testified, but she offered no specifics addressing the charges against her. She blamed her subordinates for the disarray her office was in; she claimed to have no knowledge of the specific items she was charged with mishandling; and she contended that the uncashed checks had been "planted" in her office. But Dr. Garcia, like Mr. Henson, reasonably concluded that Plaintiff had wholly failed to perform her duties as Payroll Coordinator. So Dr. Garcia upheld her termination, not because she engaged in protected activity, but because she failed to do her job.

Plaintiff cannot establish that Chris Henson's legitimate, non-discriminatory reasons for suspending, and later terminating, her employment (1) had no basis in fact, (2) did not actually

motivate his actions, or (3) were insufficient to motivate his actions. Accordingly, she cannot establish that Mr. Henson's actions were pretextual. Accordingly, for this additional reason, Plaintiff's retaliation claim fails as a matter of law.

## IV. CONCLUSION

Plaintiff's retaliation claim fails for three reasons. First, Plaintiff's claim fails because she cannot establish the second element of a prima facie case – she cannot show that the decisionmaker in this case, Chris Henson, knew about her protected activity. Second, Plaintiff's claim fails because she cannot establish the fourth element of a prima facie case – she cannot show a causal connection between her protected activity and Mr. Henson's decision to suspend, and later terminate, her employment. Finally, Ms. Crawford's claim fails because, even if she could establish a prima facie case, she has no evidence that Mr. Henson's legitimate, non-discriminatory reasons for terminating her employment are a pretext for retaliation.

Plaintiff was not fired because she provided information during an in-house sexual harassment investigation. She was fired because she wholly failed to perform her duties as Payroll Coordinator. For these reasons, and as set forth above, the Metropolitan Government respectfully requests that this Court dismiss Plaintiff's retaliation claim.

THE DEPARTMENT OF LAW OF THE
METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY
Sue B. Cain, #9380, Director of Law


/s/ Kevin C. Klein_____
Kevin C. Klein, #23301
Allison Bussell, #23538
Assistant Metropolitan Attorney
P.O. Box 196300
Nashville, TN 37219
(615) 862-6341


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been forward via the Court's electronic filing system to Ann Buntin Steiner, 214 Second Avenue North, Suite 203, Nashville, Tennessee 37201; on this the 17th day of August, 2009.


/s/ Kevin C. Klein_____
Kevin C. Klein