IN THE UNITED STATES DISTRICT COURT FOR TENNESSEE
FOR THE MIDDLE DISTRICT
NASHVILLE DIVISION


VICKY S. CRAWFORD,                  )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )       No. 3:03-0996
                                    )       JURY DEMAND
THE METROPOLITAN                    )
GOVERNMENT OF NASHVILLE AND         )
DAVIDSON COUNTY, TENNESSEE,         )
DR. GENE HUGHES AND                 )
DR. PEDRO GARCIA                    )
                                    )
        Defendants.                 )
                                    )


**PLAINTIFF'S BRIEF AND MEMORANDUM OF LAW IN OPPOSITION TO THE
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In the fall of 2001, the Metropolitan School Board hired Dr. Pedro Garcia to be the new

Director of Schools. During Garcia's administration, Gene Hughes was brought in as the

Employee Relations Director. (Crawford Aff. ¶ 3, Ex. 1). Hughes had a history of extensive

violations of the discrimination laws, having been charged with sexual harassment of several co-

workers in Florida[1] and having his teaching certificate actually revoked in the state of Florida as

a result of this sexual harassment and use of school funds for his own use. This revocation took

place after he was already at Metro in June of 2002. (Ex. 15)[2].

---

[1] The sexual harassment included "inappropriate, unsolicited and unwelcome comments concerning their dress or appearance and requests for sexual favors." (Ex. 15).

[2] Hughes's credibility will be a critical issue in this lawsuit. Plaintiff would assert that Hughes is simply not credible. Some, but not all, of the completely unbelievable statements made by Hughes are as follows: Hughes testified in his deposition taken on June 3, 2004, that he could not recall being disciplined or reprimanded at any other place before he came to Nashville. (Hughes Depo. pp. 37, Ex.7). Hughes actually had his teaching certificate revoked in the state of Florida as a result of sexual harassment. (Ex.2). Hughes testified that he tried to secure a Tennessee

1

After Hughes became in charge of the Employee Relations Department, he began to sexually harass numerous employees at Metro.[3] As a result of the sexual harassment, Veronica Frazier, from the Metropolitan Government's Human Resources Department conducted an investigation of Hughes. Despite consistent statements by three female employees of separate incidences of Hughes engaging in outrageous sexual harassment, the Defendant merely found Hughes guilty of "inappropriate behavior," and found that the allegations were in large part unsubstantiated because there were no witnesses to the incidents outside of Hughes and the victims. Thus, he was only found guilty of the conduct that he admitted. (Ex. 16)[4] (Frazier Depo., pp. 80-81, Ex. 3).

---

Administrators License when he came here, but he was denied this because his licenses were out of date and that both his certificates from Florida and Montana were out of date. (Hughes Depo. pp. 131-132, Ex. 7). In actuality, his license had been revoked. (Ex. 15). Hughes denies telling anyone he was ever a football player for the Pittsburgh Steelers. (Hughes Depo., p. 42, Ex. 7). All the other witnesses testified otherwise. (Frazier Depo., pp. 83, Ex. 3). Hughes's resume, which he gave Metro, clearly states that he was a pro football player. Hughes testified that he has no idea how Metro obtained the resume produced by Metro and has no idea who actually typed or gathered the information for the resume. (Hughes Depo., p. 135, Ex. 7). Metro claims this is the resume produced to it by Hughes. (Ex. 17). On the very first interview for the sexual harassment investigation, Hughes brought his resume into the office and had a lapel pin that had a Pittsburgh Steelers logo on it. When Veronica Frazier looked at the resume and saw he had played football at Penn State and was a Pittsburgh Steeler, she questioned him about this. He indicated to her that he had played football for the Pittsburgh Steelers and Penn State (Frazier Depo., pp. 83, 84, Ex. 3). Garcia even admitted that it was common knowledge that Hughes had played for the Pittsburgh Steelers. (Garcia Depo., p. 33, Ex. 5).

[3] The fact finding report stated in part as follows: When a witness would state "Hi, Hughes. What's up?" Hughes would grab his crotch and say, "I'll tell you what's up," Hughes would walk up to a window facing into a victim's office and say, "Hey baby, come on, don't you want to get close to my body?", the victim then would state that Hughes proceeded to rub his body against the window. A victim stated that Hughes came in and asked her, "Why don't you show me some titties?" The witness replied, "I better not, Pedro would not like that." Hughes said, "You never know, he might." Hughes's normal response to a verbal exchange would include, "Go to hell," or "Kiss my ass". Hughes would ask the victims, "What the f--- do you think you're doing?" Hughes would engage in hand gesturing and motioning in front of his crotch. Hughes often used the phrase, "bite me." (Fact Finding Report, Ex. 16).

[4] In the investigation, Hughes admitted making the statement "Bite me". Additionally, more than one witness said that Hughes would grab his crotch. (Frazier Depo., p. 80, Ex. 3). However, Frazier indicated that this was not sexual harassment. (Frazier Depo., pp. 79-80, Ex. 3). Hence, because only one witness claimed that Hughes entered her office, and pulled the witnesses head into his crotch, this allegation would be uncorroborated because Metro needed two witnesses to confirm this. (Frazier Depo., pp. 80-81, Ex. 3).

The three individuals who told Frazier of Hughes' sexual harassment were immediately investigated by Hughes and all three promptly discharged. Dr. Williams was waiting in Sadler's office to fire her when Sadler returned from Dr. Garcia's office after having picked up the fact finding report (Sadler Aff., ¶¶ 10-11, Ex.18). Dianne Proffitt's position was eliminated four days after she was interviewed by Frazier. (Proffitt Aff., ¶¶ 13, 20, Ex.19). Plaintiff, Vicky Crawford, was terminated in November of 2002 after having been accused of embezzlement and drug use (Crawford Aff., ¶¶ 11-13, Ex. 1). It is critical to note that on the same date that the fact finding report was sent out by Frazier, September 13, 2002, Frazier sent a letter to the internal audit department requesting that an investigation be conducted into the department Plaintiff ran, the payroll department. The initial allegations concerned "mostly poor management of garnishments, sloppy timekeeping". (Ex. 22). Hughes made the auditors aware of these allegations. (Hughes Depo., pp. 122-123, Ex. 7; McDoniel Depo., pp. 5, 22, 24, Ex. 8). On October 23, 2002, Hughes, the subject of the sexual harassment investigation, made allegations "now alleging misappropriation of funds". (Ex. 22). As a result of that investigation, Frazier was contacted by KPMG and questioned with regard to three employees, Crawford, Proffitt, and Sadler, the exact three who had testified against Hughes. (Frazier Depo., pp. 68-69, Ex. 3).

Plaintiff would state that Metro retaliated against the Plaintiff and the other victims of Hughes by allowing investigations to be conducted into their affairs, resulting in wrongful terminations, while if Metro had conducted even the barest of investigations into Hughes, it would have discovered his reprehensible past.

## FACTS

Plaintiff worked for The Metropolitan Government of Nashville and Davidson County, Tennessee for over 30 years. She started out as a receptionist in food services. She was promoted

to Payroll Clerk in approximately 1975 and held this position for three years. Then she was promoted to Payroll Coordinator. This was her position when she was fired. She always received good evaluations throughout the course of her employment with Metro. (Crawford Aff., ¶ 1, Ex. 1). In fact, just prior to engaging in the protected activity, she received an outstanding overall performance rating on August 2, 2000. In this evaluation, she was given the highest rating possible in eight out of ten categories. In the remaining two categories, she received the second highest rating possible. Her evaluation stated that she displayed outstanding ability to apply sound reason and had an excellent understanding of the duties and required few directions. (Crawford Aff., ¶ 22, Ex. 1) (Ex. 13)

In approximately May of 2002, Jennifer Bozeman, an attorney for The Metropolitan Legal Department, contacted the Human Resources Department about a potential sexual harassment complaint with regard to Hughes, the Director of Employee Relations for The Metropolitan Nashville Public School System. (Crawford Aff., ¶ 4, Ex. 1). It is believed Hughes sexually harassed Bozeman. (Sullivan Depo Ex. 9, Ex. 31). (Ex. 4). Bozeman contacted another employee, Tamara Sadler, about Hughes and Bozeman implied to Sadler that Hughes had harassed Bozeman. (Sadler Aff., ¶ 4, Ex. 18). Sadler then confirmed other employees had told her the same about Hughes. (Sadler Aff., ¶ 4, Ex. 18). Bozeman then contacted the Human Resources Department about this. (Crawford Aff., ¶ 4, Ex. 1).

Because Hughes was responsible for EEOC investigations, including complaints of sexual harassment, this sexual harassment complaint with regard to Hughes was brought to the attention of Dr. Pedro Garcia. (Crawford Aff., ¶ 5, Ex. 1).

In the course of this investigation, the officials at Metro contacted Plaintiff about Hughes and Plaintiff was told by Frazier that she was conducting a sexual harassment investigation and

4

needed to speak with her. On July 22, 2002, Plaintiff showed up at the legal department for Metro as requested and Frazier and Kim Barwise questioned her about whether or not she had any information with regard to inappropriate physical conduct or inappropriate behavior on behalf of Hughes. (Crawford Aff., ¶ 6, Ex. 1).

Plaintiff knew immediately that Gene Hughes was the one being investigated for sexual harassment. Plaintiff told the investigators Hughes sexually harassed her and other employees. She informed them that he had asked to see her titties on numerous occasions. She would state "Hey, Dr. Hughes what's up" and he would grab his crotch and state "You know what's up". He would approach her window and put his crotch up to the window and ask to see her titties all at the same time. She told him "No, Dr Garcia wouldn't like that" and he told her "You don't know, he just might". One time, Hughes came into her office and she asked him what she could do for him and he grabbed her head and pulled it to his crotch. She pushed him away and told him to get the hell out of her office. Plaintiff believed that she was exercising her rights under Federal law when she informed Frazier of this. Plaintiff informed both Frazier and Barwise that Hughes had sexually harassed her and other employees. When she made these statements she was opposing the illegal actions of Hughes. (Crawford Aff., ¶ 7, Ex. 1).

On September 13, 2002, Frazier and Barwise sent a fact finding report to Dr. Garcia. In the fact finding report it was noted that more than one witness referenced their perception of Hughes' arrogance and penchant for grabbing his crotch. It was also determined that two of the witnesses were "especially fearful about loss of their job. The witness's apprehension about participating in this investigation was greater than fact finders would reasonably expect." Plaintiff was identified on the first page of the report as being one of the nine employees interviewed. This list of nine included Hughes. (Ex. 12 & 16).

On the same date that the fact finding report was issued, Frazier sent a letter to the Internal Audit Department informing them of certain concerns in the payroll department. (Ex. 28). This investigation was conducted as a result of Hughes contacting the auditing department about Plaintiff. (Hughes Depo., pp. 122-123, Ex. 7). These complaints that Frazier referred to the audit department concerned "mostly poor management of garnishments, sloppy timekeeping." (Ex. 22). On October 23, 2002, Hughes, the subject of the investigation, then alleged misappropriation of funds. (Ex. 22). Kim McDoniel, Audit Manager for Metro, was the main contact between KPMG and Metro during this investigation. McDoniel testified that the allegations of fraud or misappropriation of funds was coming from Hughes. (McDoniel Depo., pp. 5, 22, 24, Ex. 8). McDoniel also testified that two other names were brought up, Dianne Proffitt and Tamera Sadler. (McDoniel Depo., pp. 24-25, Ex. 8). The three employees who made statements about Hughes engaging in sexual harassment were Sadler, Crawford, and Proffitt. (Frazier Depo., pp. 61-65, Ex. 3). When the KPMG auditors came to Metro they questioned Frazier about three employees, Proffitt, Sadler, and Crawford. (Frazier Depo., pp. 68-69, Ex. 3).

After fully cooperating with The Metropolitan Government's investigation of Gene Hughes on November 6, 2002, Plaintiff was placed on administrative leave from her job with Metro stating that Metro was investigating whether or not Plaintiff had embezzled money from the district. Plaintiff had not embezzled any money from the district. (Crawford Aff., ¶ 12, Ex. 1). Dr. Garcia told the board members he would not identify the woman or the amount of money involved. Dr. Garcia added that the officials have yet to determine if the alleged embezzlement is related to drug use. Ms. Crawford does not use drugs nor did she embezzle funds. (Crawford Aff., ¶¶ 12, 14, Ex. 1).

6

The KPMG investigation occurred the last week of October and the first two weeks of November 2002 (Defendant's Statement of Material Facts No. 10), and the KPMG investigator denied investigating any allegations of embezzlement (Sullivan Depo., pp. 22, 163, 189-190, Ex. 31) and testified that no one from KPMG had ever indicated that they had found any evidence of embezzlement linked to Vicky Crawford. (Sullivan Depo., p. 23, Ex. 31). Sullivan further denied KPMG discovering any issue of drug use with Vicky Crawford. (Sullivan Depo. p. 23, Ex. 31).

Yet on November 9, 2002, Defendant released to the Tennessean that Plaintiff was placed on administrative leave from her job while Metro investigated whether or not Plaintiff had embezzled money from the district. (Newspaper articles, Ex. 30). Dr. Pedro Garcia told the board members he would not identify the woman or the amount of money involved. Dr. Pedro Garcia added that the officials have yet to determine if the alleged embezzlement is related to drug use. (Crawford Aff., ¶¶ 12, 14, Ex. 1).

Thereafter on November 23, 2002, well after the KPMG investigation had concluded and no evidence of embezzlement was found, Metro still told the Tennessean that it was meeting to determine if charges of embezzlement should be brought and identified the employee as Vicky S. Crawford. (Newspaper Articles, Ex. 30). Sullivan denies ever meeting to discuss whether embezzlement charges should be brought. (Sullivan Depo. p. 190, Ex. 31).

On December 12, 2002, a hearing was held with regard to the Plaintiff's termination. In that hearing, Plaintiff's counsel told Chris Henson that Plaintiff testified against Hughes in terms of sexual harassment and that Metro rather than firing Gene Hughes walked in and fired the women who complained about Hughes. Henson was told that the charges against Plaintiff were trumped up in retaliation. Additionally, Henson was provided a copy of the sexual harassment investigation fact finding report. (Crawford Aff., ¶ 18, Ex. 1) (Dec 12, 2002 Hearing, pp. 6-15,

7

Ex. 10) (Henson Depo., p. 16, Ex. 21). Additionally, at this hearing, Plaintiff did not have access to any of the computer files or the "void and see" files nor any of the paperwork which would have allowed her to clearly testify to Metro as to the status of the checks which Metro claims she failed to process. (Crawford Aff., ¶ 18, Ex. 1). In this hearing, Metro refused to allow Plaintiff to call certain witnesses and stopped the questioning at times. (Dec 12, 2002 Hearing, pp. 12, 19, Ex. 10). In this hearing, Mr Bohenstiel, Plaintiff's supervisor, testified that no one had ever complained to him about any of the checks listed in the charge letter. (Dec. 12, 2002 Hearing, pp. 29-43, Ex. 10). He also testified that voided checks should be saved. (Dec. 12, 2002 Hearing, pp. 29, Ex. 10).

Plaintiff was fired on January 6, 2003, after having been put on administrative leave on November 6, 2002. Henson, in terminating her employment, stated that he was disregarding the allegation that she had improperly handled the voided checks. (Crawford Aff., ¶ 19, Ex. 1) (Ex. 29).

On February 6, 2003, Dr. Garcia held a termination hearing. Joe Sullivan, the KPMG investigator, who was hired by Metro to investigate Ms. Crawford, testified that he was told not to put his findings in writing. He allegedly found checks in her office; however, her office processes approximately 25,000 employee checks and approximately 1,000 vendor checks per month. He did not conduct any investigation to determine if these checks were voided checks and he had no idea whether or not the checks were voided. He found no evidence of embezzlement. (Feb. 6, 2003 Hearing, pp. 52-70, Ex. 11). Typical testimony from Mr. Sullivan with regard to all the checks can be illustrated by his testimony with regard to the Monumental Life Insurance Company check, the UNUM Life Insurance Company check, Prudential Life Insurance and Juvenile Court. For all of these checks, he testified that he had no idea whether or

not these checks were mailed and whether or not these checks were properly voided on the system nor did he call any of these entities to inquire whether or not they received payment for these checks, because he was not requested to do so. He also testified that he had no knowledge of whether or not Ms. Crawford was following proper procedure if these checks were found in his office. (February 6, 2003 Hearing, p. 57). He also found that Metro had no written policy with regard to voided checks. (Feb. 6, 2003 Hearing, pp. 40-41) (Crawford Aff., ¶ 21, Ex. 1). Not a single witness testified that an entity had not been paid. The whole testimony concerned merely finding checks in a payroll office that processed 26,000 per month. Mr. Sullivan could not testify as to any specifics about whether or not a vendor or employee had not been paid and testified that he was not instructed to do so. Based upon this half investigation, Dr. Garcia upheld the termination. (Ex. 20).

After discovery has been completed, and Plaintiff was granted access to the records, Plaintiff has discovered that a majority of the checks found were voided checks. Additionally, Plaintiff was fired for failure to deposit the MetLife check when even one year after her termination Metro still had not deposited that check. MetLife had to reissue the check and rather than Metro depositing the check, Metro finally got the proper paperwork to MetLife and Metro has never deposited that check. (Crawford Aff., ¶ 24, Ex. 1) (Cardwell Depo., pp. 32-33, Ex. 13).

The three individuals who told Frazier of Hughes' sexual harassment were immediately investigated by Hughes and all three promptly discharged. Williams was waiting in Sadler's office to fire her when Sadler returned from Garcia's office after having picked up the fact finding report. (Sadler Aff., ¶¶ 10-11, Ex.18). Proffitt's position was eliminated four days after she was interviewed by Frazier. (Proffitt Aff., ¶¶ 13, 20, Ex.19). Plaintiff was placed on administrative leave on November 7, 2002, and fired on January 6, 2003, after having been

9

accused of embezzlement and drug use and later of questionable financial procedure. (Crawford Aff., ¶¶ 11-13, Ex. 1). Bozeman's complaint against Hughes was never set forth in the fact finding report. Bozeman kept her job with Metro.

# I. **ARGUMENT**

Section 704(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), prohibits retaliation for opposing any practice made an unlawful employment practice by this subchapter, (opposition clause) or for making a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter, (participation clause).

In our case, the United States Supreme Court ruled this protection extended under the opposition clause to the statements Plaintiff told Frazier "as an ostensibly disapproving account of sexually obnoxious behavior toward her by a fellow employee." *Id.* at 850. *Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee,* 129 S. Ct. 846, 850 (U.S. 2009).

A plaintiff in a Title VII or ADEA action may establish retaliation either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation. *DiCarlo v. Potter,* 358 F.3d 408, 420 (6th Cir.2004). *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 543-544 (6th Cir. 2008).

To set forth a claim for retaliation based on circumstantial evidence, under the McDonnell Douglas framework the employee must establish that: (1) she engaged in Title VII-protected activity; (2) the employer knew that she engaged in the protected activity; (3) the employer subsequently took an adverse employment action; and (4) the adverse action was causally related to the protected activity. *Mickey v. Zeidler Tool and Die Co.,* 516 F.3d 516, 523 (6th Cir.2008) (quoting *Weigel v. Baptist Hosp. of E. Tenn.,* 302 F.3d 367, 381 (6th Cir.2002)).

After the employee sets out her prima facie case, the burden of production shifts to the employer to offer a non-discriminatory reason for the adverse employment action. *Dixon v. Gonzales,* 481 F.3d 324, 333 (6th Cir.2007). If the employer meets this burden, then the burden of production shifts back to the employee to demonstrate that the proffered reason was mere pretext. *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). *Ladd v. Grand Trunk Western R.R., Inc.*, 552 F.3d 495, 502 (C.A.6 (Mich.),2009). "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir.2000). The Plaintiff need only put forth "some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." This burden is minimal. *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000).

**2. Plaintiff can establish that Chris Henson and the Defendant knew that Vicky Crawford engaged in protected activity.**

**A. Henson was told Plaintiff engaged in protected activity and was being retaliated against and these statements were transcribed by a court reporter.**

It is unbelievable that this defendant would actually argue Chris Henson did not know that Plaintiff engaged in protected activity. At the December 12, 2002 hearing, Henson held to determine whether to terminate Plaintiff, Henson, at the very beginning of the hearing, was told by Plaintiff's counsel that Plaintiff had gone forward with sexual harassment charges against Hughes with four other women and three lost their jobs and one was placed on administrative leave and that this was "blatant retaliation". (Dec. 12, 2002 Hearing, p. 10, Ex. 10). Henson was told Crawford was "one of the women who testified against Hughes in terms of sexual harassment" and that Crawford was "terminated for retaliation." (Dec. 12, 2002 Hearing, p. 6,

Ex. 10). And that the charges against her were "trumped up…in retaliation". (Dec. 12, 2002 Hearing, p. 7, Ex. 10). Counsel for Crawford told Henson as follows:

> For the record, my client is informing Metro that the only reason she was being investigated for anything is because she was one of the ones who made statements about Dr. Hughes. They were atrocious statements. Three other women came forward and made the same type of statements. Three women have been fired; my client's here at this hearing today that she doesn't believe she would ever be at if not for Dr. Gene Hughes. (December 12, 2002 Hearing, p. 13, Ex. 10).

All of these statements were made at the beginning of the hearing before Henson made the decision to terminate Plaintiff. A court reporter was at this hearing and transcribed these statements; thus, for this Defendant to argue Henson had no knowledge when clearly he did undercuts all veracity of this Defendant. Henson was even given a copy of the fact finding report containing Plaintiff's name and the sexual harassment allegations at this December 12, 2002 hearing. (Henson Depo., p. 16, Ex. 21).

Henson did everything possible to prohibit Plaintiff from setting forth her retaliation claim. (Dec. 12, 2002 Hearing, p.14, Ex. 10). Even after he was told of this claim, he did nothing to investigate this.

Henson started with Metro on July 1, 2002, as the Assistant Superintendent for Business and Facility Services. (Henson Depo., pp. 6, 35, Ex. 21). If someone had a complaint about Hughes sexually harassing them it should have been brought to his attention. Even if the complaint was taken to Human Resources, policy required Human Resources to bring it to Henson's attention. (Henson Depo., pp. 34-35, Ex. 21). Thus, the Defendant's own policy required that Henson be made aware of the sexual harassment complaint.

Henson even admitted in his deposition that he knew of the Hughes investigation but could not recall who told him this. (Henson Depo., p. 16, Ex, 21).

**B.      Henson did not make the decision to terminate Plaintiff, he merely made a recommendation to Dr. Garcia, Ex-Director of Schools, and Dr. Garcia made the decision to terminate Plaintiff.**

Further, contrary to Defendant's argument, Henson testified in his deposition that he did not make the decision to fire the Plaintiff but rather this decision was made by Dr. Garcia and that Henson merely made a recommendation to Dr. Garcia. Henson testified that the decision to terminate an employee is ultimately made by Dr. Garcia, the Director of Schools. Dr. Garcia makes this decision for all terminations, because every employee reports to Dr. Garcia. Henson merely makes the recommendation and then it ultimately follows through the chain of command to Dr. Garcia and then it is processed through Human Resources. (Henson Depo., pp. 12-13, Ex. 21). Additionally, Dr. Pedro Garcia is the individual who made the decision to affirm Plaintiff's termination in the Plaintiff's appeal of her dismissal. (Ex. 20).

No argument is made by Defendant that Dr. Garcia had no knowledge. In fact, all facts show Dr. Garcia did know Plaintiff engaged in protected activity. Dr. Garcia testified that when the allegations of sexual harassment first arose, right after he had spoken with Jennifer Bozeman, he spoke with Hughes about it and Hughes told him that he thought it had to do with Vicky Crawford and Tamara Sadler and that these two were retaliating against Hughes because Hughes was investigating the sick bank. (Garcia Depo., pp. 76-77, Ex. 5).[5] Along with this testimony of Dr. Garcia, Dr Garcia testified also clearly testified that he made the assumption when the report came back in September that these were the ones who complained. (Garcia Depo., pp. 75-78, Ex. 5). Dr. Garcia testified that he didn't know the names of the ones who complained until September 2002 and this testimony indicates that he did know their names after the fact finding

_____

[5] Despite the numerous allegations against Vicky Crawford, including embezzlement and drug use, there were no allegations of any problems with the sick bank, leading once again to questions about Gene Hughes' credibility.

report was generated. (Garcia Depo., p. 65, Ex. 5). This knowledge was obtained just several weeks before Plaintiff was placed on administrative leave.

On September 13, 2002, Frazier finalized the fact-finding report. This report listed the names of the witnesses as follows:

1. Jennifer Bozeman
2. Diane Burden
3. Vicky Crawford
4. Jackie Gauthier
5. Gene Hughes
6. Jamye Merritt
7. Dianne Proffitt
8. Tamara Sadler
9.VeronicaWilliams
(Ex. 16).

Dr. Garcia was given a copy of this fact finding report. (Garcia Depo., p. 65, Ex. 5).

Thereafter, on November 7, 2002, the Plaintiff was suspended from her job without pay and fired on January 6, 2003. (Crawford Aff., ¶ 19, Ex. 1).

Additionally, there is evidence that even before the fact finding report was generated that Dr. Garcia knew of the identity of the complaining parties, because it was the policy of Metro to ensure that no retaliation took place and that could only be accomplished by informing the department head who had made the complaint and that there can be no retaliation. Frazier, the Assistant Director of Human Resources for the Metropolitan Government, was assigned to investigate the complaints against Hughes (Frazier Depo., p. 5, Ex. 3). Frazier is responsible for investigating complaints of discrimination at Metro. (Frazier Depo., p. 6, Ex. 3). She follows a set procedure in conducting her investigations. (Frazier Depo., p. 6, Ex. 3). Frazier will inform the employees that retaliation is illegal "absolutely, every single time". Frazier lets management in that department know, whether it be the department head, the division manager, and it may be the supervisor that they cannot retaliate. She lets the department head know that he is supposed

to pass this information to the supervisors so that there can be no retaliation and then the department head would tell the alleged harasser that they cannot engage in retaliation. This is done from the beginning of the investigation. She agreed that it is a fair statement that then the supervisor and the alleged harasser know the individuals who have made the complaint and that they cannot retaliate against these individuals. (Frazier Depo., pp. 12-13, Ex. 3).

Pursuant to this policy, Frazier then met with Garcia, Hughes, Safley and Bozeman and gave an outline of how the investigation would proceed. (Bozeman Depo., p. 65, Ex. 4). In this meeting, she gave him her comments and observations about retaliatory actions. (Frazier Depo., p. 25, Ex. 3).[6] Frazier told them that "those folks who participate in the investigation should not, again -- should be able to go forward without fear of retaliation". (Frazier Depo., p. 27, Ex. 3). Likewise, Garcia testified that Hughes told him after his initial interview with Jennifer Bozeman that Crawford and Sadler had something to do with the investigation. (Garcia Depo., p. 76, Ex. 5).

Thus, if Metro followed its set procedure, then Frazier informed Dr. Garcia, the department head, of the names of the complaining parties so that there could be no retaliation. Dr. Garcia would have known this information prior to the fact finding report being issued in September 2002. Regardless of whether Dr. Garcia knew Ms. Crawford was one of the complaining parties prior to September 2002, he certainly knew it after September 2002, weeks before her termination. (Garcia Depo., pp. 65, 75-78, Ex. 5). These facts preclude summary judgment at this stage.

---

[6] In this initial conversation, Sadler and Proffitt and some other employees in HR appeared to have been mentioned and Veronica Frazier informed Garcia that "it may feel like these folks are holding your workplace hostage, and in a way they are, but you must be careful and not proceed with actions that could be perceived as retaliatory." (Frazier Depo., p. 26, Ex. 3).

Likewise, in our situation, it should be noted that Frazier is in the Human Resources Department, which is the department who investigated the sexual harassment allegations against Hughes, and is the department that Henson would process terminations through. (Henson Depo., pp. 12-13, Ex. 21).

Garcia held his own hearing into Plaintiff's termination and once again was told, at the beginning of the hearing that Plaintiff made statements about Hughes engaging in intolerable conduct and Metro was trying to get rid of everyone who complained of Hughes. (February 6, 2003 Hearing, pp. 7-9, Ex. 11). Thus, Garcia clearly knew Plaintiff participated in protected activity before he made the decision to affirm her termination.

**3.    Plaintiff can show a causal connection between her protected activity and Chris Henson's decision to terminate her.**

"The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen* at 563 (6th Cir.2000). Plaintiff need only put forth "some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." This burden is minimal. *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000).

Contrary to Defendant's assertion that time alone cannot establish a causal connection, the Sixth Circuit in *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516 (6th Cir. 2008), found just the opposite, ruling time alone can establish a *prima facie* case. "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Id.* at 525. But if there is an elapse of time, the employee "must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* at 525.

Here, on September 13, 2002, the same date that the fact finding report was distributed (Ex. 12 & 16) Veronica Frazier sent a letter to the Internal Audit Department informing them of serious complaints about Plaintiff's department, the payroll department. (Ex. 28). This investigation was conducted as a result of Gene Hughes contacting the auditing department about Crawford. (Hughes Depo., pp. 122-123, Ex. 7).

Hence, the retaliation took place on the same day as the fact finding report was distributed. These initial complaints that Frazier referred to the audit department concerned "mostly poor management of garnishments, sloppy timekeeping." (Ex. 22). On October 23, 2002, Hughes, the subject of the investigation, then alleged misappropriation of funds. (McDoniel Depo., pp. 5, 22, 24, Ex. 8).

On July 22, 2002, Plaintiff told Frazier that Hughes sexually harassed her and other employees.[7] By September 13, 2002, Plaintiff was being investigated. By November 6, 2002, Plaintiff was placed on administrative leave with Metro stating that Metro was investigating whether Plaintiff had embezzled money from the district. (Crawford Aff. ¶ 12, Ex. 1). Plaintiff was fired on January 6, 2003. (Crawford Aff. ¶ 19, Ex. 1).

In *Singfield v. Akron Metropolitan Housing Authority,* 389 F. 3d 555 (6th Cir. 2004), a causal connection was established where Plaintiff was terminated just over three months after having filed a discrimination charge. The Sixth Circuit concluded "that the temporal proximity of these events is significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying Singfield's burden of demonstrating a prima facie case." *Id.* at 563. In

---

[7] Plaintiff informed the investigators that Hughes had asked to see her "titties" on numerous occasions. Plaintiff would state Hey Dr. Hughes what's up and he would grab his crotch and state "You know what's up". He would approach her window and put his crotch up to the window and asked to see her titties all at the same time. Plaintiff told him "No, Dr Garcia wouldn't like that" and he told Plaintiff "You don't know he just might". One time Gene Hughes came in Plaintiff's office and she asked him what she could do for him and he grabbed her head and pulled it to his crotch. Plaintiff pushed him away and told him to get the hell out of her office. (Crawford Aff. ¶¶ 6-7, Ex. 1).

*Singfeld*, the Sixth Circuit cited with approval *Hochstadt v. Worcester Found. for Experimental Biology, Inc.,* 425 F.Supp. 318, 324-25 (D.Mass.), *aff'd* 545 F.2d 222 (1st Cir.1976), where plaintiff's discharge six months after the EEOC settlement satisfied the causation requirement. *Id.* at 563. In *Asmo v. Keane, Inc.* 471 F. 3d 588 (6th Cir. 2006), temporal proximity of two months of learning Plaintiff was pregnant and Plaintiffs' termination was sufficient to establish a causal connection. *Id.* at 594.

Plaintiff would state on the same date of the fact finding report clearing Hughes, Defendant began its investigation of Plaintiff. This alone should establish the causal connection.

If this Court should determine that there was a lapse of time requiring further evidence to set forth a prima facie case, Plaintiff can meet that burden. "[T]o establish the element of causal link a plaintiff is required to "proffer evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action. …requires "merely that the plaintiff establish that the protected activity and the adverse action were not wholly unrelated.".*E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997). No one factor is dispositive but evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. *Nguyen* at 563. Proximity in time coupled with more frequent disciplinary write-ups for trivial matters and unwarranted criticism establish a causal connection. *Moore v. KUKA Welding Systems & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999).

Here, Crawford always received good evaluations throughout the course of her employment with Metro. In fact, just prior to engaging in the protected activity, she received an outstanding overall performance rating on August 2, 2000. In this evaluation, she was given the highest rating possible in eight out of ten categories. In the remaining two categories, she

received the second highest rating possible. Her evaluation stated that she displayed outstanding ability to apply sound reason and had an excellent understanding of the duties and required few directions. (Crawford Aff., ¶¶ 1, 22, Ex. 1)(Ex. 13). Further, a performance audit of Crawford's office was done in 2000-2001 and there were no specific problems noted except that more staff was needed. (McDoniel Depo. p. 18, Ex. 8).

It was only after engaging in the protected activity that the harasser was allowed to accuse Plaintiff of wrongdoing in just about every area of her job performance and even attack her boyfriend as having a forged signature on his W-4. (Hughes Payroll Concerns, Ex. 33). Plaintiff was terminated for having checks in her office when she was the payroll coordinator in an office that processed approximately 25,000 employee checks and approximately 1,000 vendor checks per month. Despite no qualms over firing Plaintiff for having these checks in her office no investigation was done to determine if these checks were voided checks or to pay the various vendors or employees. (Sullivan Depo., pp. 185-186, Ex 31). Plaintiff, after conducting her own investigation, determined that they were voided checks. (See Plaintiff's Response to Defendant's Statement of Material Fact No. 23, setting forth in detail Plaintiff's investigation into each check listed in the charge letter; Crawford Aff. ¶ 29, Ex. 1).

Plaintiff was terminated for problems in the payroll department, while no other employee was counseled, disciplined or reprimanded and the defendant did not investigate which employee was the one responsible for the check but placed all responsibility on the Plaintiff as the supervisor. (McDoniel Depo. p. 50, Ex 8).

Defendant argues Plaintiff cannot establish a causal connection based in part, upon the grounds Defendant used to terminate the Plaintiff. (Defendant's Brief p. 12). However, the Sixth Circuit has held that the district court should not give any consideration to the employer's reason

for termination in determining whether the employee has set froth a *prima facie* case of discrimination "[I]t is equally inappropriate for the district court in the pre-trial stage to rely on the nondiscriminatory reason for termination to find plaintiff's prima facie case inadequate. This is true even if that "production" evidence happens to show that, in the employer's view, the plaintiff was not meeting its legitimate expectations for the position at issue. *Aikens* instead mandates that at least with respect to the employer's proffered nondiscriminatory reason, the prima facie case is no longer relevant-it has "dropped out" of the inquiry." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6thCir. 2000).

However, Plaintiff has ample evidence that the Defendant's reason for termination is false. This evidence is set forth in detail in section 4c. of this brief.

**4. Defendant has failed to offer a legitimate non-discriminatory reason for Plaintiff's termination and Plaintiff can show Defendant's stated reason is pretextual.**

**a. Summary Judgment is not appropriate where Plaintiff has set forth a *prima facie* case of discrimination.**

The Sixth Circuit has stated that caution should be exercised in granting summary judgment once a plaintiff has established a prima facie inference of retaliation through direct or circumstantial evidence. *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 564 (6th Cir. 2004). This is because "in discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain" and as "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes," thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage" and because the "crux of a Title VII dispute is the "elusive factual question of intentional discrimination." (Cites omitted). *Id. at* 564.

**b. Defendant has not met its burden to offer a legitimate, non-discriminatory reason for Plaintiff's termination.**

This Defendant has failed to set forth a legitimate, non-discriminatory reason for Plaintiff's firing. In meeting this burden the Defendant must "explain what it has done or produces evidence of legitimate non-discriminatory reasons." *Mitchell v. Georgia-Pacific Corp.* 1996 WL 397427, 3 (6th Cir. 1996).

Defendant has not set forth a valid reason for the Plaintiff's termination. Even Defendant's Brief cannot set forth one valid reason for termination; hence it states Plaintiff 's division had "operational irregularities", "she was charged with misconduct", Plaintiff mismanaged the Payroll Division" and her office was in disarray without setting forth one fact to justify any of these conclusions. (Defendant's Brief p. 14). Defendant claims Plaintiff mishandled checks but fails to set forth how the checks were mishandled. Defendant has accused Plaintiff of numerous, ever changing allegations, and when no evidence was found to substantiate these claims, sent the investigator from KPMG to search Plaintiff's office and when he found checks, intentionally instructed the investigator not to fully investigate to determine if they were merely voided checks. (McDoniel Depo., p. 33, Ex. 8) (Feb. 6, 2003 Hearing, pp. 52-70, Ex. 11). Plaintiff was fired for these checks in her office and she has since, through discovery, shown these were merely voided checks. (See Plaintiff's Response to Defendant's statement of Material Fact No. 23, setting forth in detail Plaintiff's investigation into each check listed in the charge letter; Crawford Aff. ¶ 29, Ex. 1).

Defendant now appears to claim Defendant claims the KPMG investigator found an office "literally unlike anything KPMG's investigator … had ever seen" (Defendant's Brief p. 13). Yet, no photographs or videotapes were made. (Sullivan Depo., pp. 145, 215-216, Ex 31). Sullivan, the KPMG investigator who went into Plaintiff's office, in the past worked for the DEA "enforcing narcotics all over the United States" (Sullivan Depo., p. 216) and he knew the

importance of documenting the scene accurately and knows the use of cameras and video tapes to properly document the scene, yet he did not take one photograph to show the alleged problems with Plaintiff's office.

Defendant caused every aspect of Plaintiff's job to be investigated (Ex.2, Payroll Concerns). It appears that *now* Defendant is claiming it fired Plaintiff for "operational irregularities". (Defendant's Brief p. 14). Defendant's accusations against Plaintiff have changed every time it knew Plaintiff could disprove the stated reason and have varied from embezzlement and drug use, to having a messy office.[8] While even the most superficial of investigations into Hughes would have shown his loss of his teaching certificate for sexual harassment, Defendant chose instead to investigate just about every aspect of Plaintiff's life. KPMG began its investigation with a three page document of Gene Hughes "Payroll Concerns" against Vicky Crawford, which covered all aspects of her office and even her private life, questioning even her boyfriend's alleged "forged signature on W-4". (Ex. 2). Gene Hughes listed three employees on his "Payroll Concerns" list, Vicky Crawford, Tamera Sadler and Dianne Proffitt, the same three who told of his reprehensible behavior. (Ex. 33).

Even KPMG's notes reveal the complaints were coming from Hughes. "Gene Hughes comes into the audit room. KPMG Mark sitting -"Look at payroll". This note focuses allegations against three employees, Plaintiff, Tamara Sadler and Dianne Proffitt. (Sullivan Depo. Ex. 10) (Ex. 31). The first complaints referred to the audit department concerned "mostly poor management of garnishments, sloppy timekeeping. (Ex. 22). On October 23, 2002, Hughes then alleged misappropriation of funds. (Ex. 22). While there was no evidence or allegations of embezzlement, (Sullivan Depo., p. 23, Ex. 31), Pedro Garcia and Henson still told the

---

[8] It is ironic that the KPMG investigator accusing Plaintiff of having a messy office, despite being and routinely taking photographs to prove evidence in cases did not take a singe photograph of Plaintiff's office.

Tennessean on several occasions, after they knew of the falsity of the statements, that Plaintiff was being investigated for embezzlement and that it was yet to be determined if it was related to drug use. (Ex. 30, Newspaper Articles). Yet no one made any indication to the KPMG investigator, Joe Sullivan, that there was any evidence of embezzlement. (Sullivan Depo., p. 23, Ex. 31). And Joe Sullivan found no evidence of embezzlement or drug use. (Sullivan Depo., p. 190, Ex. 31). Further, how can an entity investigate embezzlement charges when it has specifically requested that the investigator not follow to paper trail to determine if the checks found were merely voided checks. (McDoniel Depo., p. 33, Ex. 8) (Feb. 6, 2003 Hearing, pp. 52-70, Ex. 11). Thus, Defendant has not offered one shred of evidence of any wrongdoing by Plaintiff.

While Defendant claims Plaintiff had original checks in her office, no evidence is offered to show these checks should not have been there, i.e. testimony that an employee did not receive his pay or a vendor did not get paid. It is to be expected that there would be checks in a payroll coordinator's office especially when the office processes 25,000 payroll and 1,000 vendor checks per month.

      **c.**      **Defendant's stated reason for firing the Plaintiff is pre-textual.**

It appears that *now* Defendant is claiming it fired Plaintiff for "operational irregularities". (Defendant's Brief p. 14). Defendant's accusations against the Plaintiff have changed every time it knew Plaintiff could disprove the stated reason and have varied from embezzlement and drug use, to having a messy office.[9] However, the charge letter accused of her very specific wrongdoings related to approximately 25 checks. Defendant is only claiming "operational irregularities" now to justify the termination because it knows Plaintiff, through discovery,

---

[9] It is ironic that the KPMG investigator accusing Plaintiff of having a messy office, despite being a DEA investigator and routinely taking photographs to prove evidence in cases did not take a singe photograph of Plaintiff's office. (Sullivan Depo., pp. 145,215-216, Ex 31).

obtained access to the information to show these checks were merely voided checks and it could not justify a termination based on voided checks. Even Henson wrote he was disregarding the allegation of not properly handling the voided checks. (Ex. 29).

Further, a close examination of the material facts Defendant claims justifies Plaintiff's termination amount to no more than Plaintiff having a messy office. (Defendant's Statement of Material Facts, No.'s 13-15). While Defendant claims Plaintiff had original checks in her office, no evidence is offered to show these checks should not have been there, i.e. testimony that an employee did not receive his pay or a vendor did not get paid. It is to be expected that there would be checks in a payroll coordinator's office especially when the office processes 25,000 payroll and 1,000 vendor checks per month. Further, Joseph C. Sullivan, the KPMG forensics investigator, who went into Plaintiff's office, worked for the DEA "enforcing narcotics all over the United States". (Sullivan Depo. p. 216, Ex. 31) and he knew the importance of documenting the scene accurately and knows the use of cameras and video tapes to properly document the scene, yet he did not take one photograph to show the alleged problems with Plaintiff's office. (Sullivan Depo., pp. 145, 215-216, Ex. 31).

A plaintiff can show pretext in three interrelated ways: (1) that the proffered reason has no basis in fact, (2) did not actually motivate the employer's action, or (3) was insufficient to motivate the employer's action. *Chen v. Dow Chemical Co.*---F.3d ---, 2009 WL 2851351, (6th Cir. September 8, 2009). The Court should look to see if the employer has an honest belief in its proffered nondiscriminatory reason for discharge. "The key inquiry in assessing whether an employer holds such an honest belief is whether the employer made a reasonably informed and considered decision before taking the complained-of action." *Michael v. Caterpillar Fin. Serv. Corp.*, 496 F.3d 584, 598-99 (6th Cir.2007); *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553,

559 (6th Cir. 2009). Here, the employer hired KPMG to justify its termination of the Plaintiff and specifically instructed KPMG, not to investigate whether the 25 checks found in Plaintiff's office, were voided checks. Both the Defendant and KMPG admit that no investigation was done to determine if the checks were voided and whether or not the vendors or employees were actually paid because this was "not within the scope of service". (McDoniel Depo. p. 33, Ex 8). Hence, no investigation was made to see if the various vendors and employees listed on the 25 checks received their funds. (Feb. 6, 2003 Hearing, pp. 52-70, Ex. 11) (Sullivan Depo., pp. 185-186, Ex 31). It should be expected that a payroll coordinator whose office processes 25,000 employee checks and approximately 1,000 vendor checks per month[10] would have the 25 checks set forth in the charge letter in her office.

Plaintiff testified that the voided check policy required her to keep voided checks in her office. (Crawford Aff. ¶ 29, Ex. 1). Further, Defendant appears to assert Plaintiff's office was a mess; however, KPMG did not bother to make any photographs of this alleged mess (Sullivan Depo., p. 145, Ex. 31). There was no honest belief present here, but only an intentional hanging posse orchestrated by Hughes for revenge and retaliation.

Pretext is also shown by evidence "that the employer's proffered explanation is unworthy of credence." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 667 (6th Cir. 2000). In citing the United States Supreme Court in *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Sixth Circuit stated as follows:

> In *Reeves,* the Supreme Court explained that
>
> [p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. *See[ St. Mary's,* 509 U.S.] at 517 [113 S.Ct. 2742] ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional

---

[10] (Crawford Aff., ¶ 21, Ex. 1).

discrimination")…. Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Id.* at 147-48, 120 S.Ct. 2097; *Imwalle v. Reliance Medical Products, Inc.* 515 F.3d 531, 545 (6th Cir. 2008).

Plaintiff can show the Defendant's reason for termination is false as follows:

1.      Plaintiff always received good evaluations throughout the course of her employment with Metro. (Crawford Aff., ¶ 1, Ex.1). In fact, just prior to engaging in the protected activity, she received an outstanding overall performance rating on August 2, 2000. In this evaluation, she was given the highest rating possible in eight out of ten categories. In the remaining two categories she received the second highest rating possible. Her evaluation stated that she displayed outstanding ability to apply sound reason and had an excellent understanding of the duties and required few directions. (Crawford Aff., ¶ 22, Ex. 1) (Ex. 13).

2.      A performance audit of Crawford's office was done in 2000-2001 and there were no specific problems noted except that more staff was needed. (McDoniel Depo., p. 18, Ex. 8).

3.      At both termination hearings, December 12, 2002 in front of Henson and February 6, 2003 hearing in front of Garcia, Ms. Crawford did not have access to any of the computer files or the "void and see" files nor any of the paperwork which would have allowed her to clearly testify to Metro as to the status of the checks which Metro claims she failed to process. (Crawford Aff., ¶¶'s 18, 21, Ex. 1). In this hearing, Metro refused to allow Ms. Crawford to call certain witnesses and stopped the questioning at times. (Dec 12, 2002 Hearing, pp. 12, 19, Ex.10).

4.      Plaintiff through discovery was able to investigate all 25 checks/documents set forth in the charge letter and determined that they were checks which were voided and the procedure used required Plaintiff to maintain these voided checks in her office. (See Plaintiff's Response to Defendant's statement of Material Fact No. 23, setting forth in detail Plaintiff's investigation into each check listed in the charge letter; Crawford Aff., ¶ 29, Ex. 1).

5.      On February 6, 2003, Dr. Garcia held a termination hearing. Joe Sullivan, the KPMG investigator, who was hired by Metro to investigate Ms. Crawford, testified that he was told not to put his findings in writing. He allegedly found checks in her office; however, her office processes approximately 25,000 employee checks and approximately 1,000 vendor checks per month. He did not conduct any investigation to determine if these checks were voided checks and he had no idea whether or not the checks were voided. (Feb. 6, 2003 Hearing, pp. 52-70, Ex. 11). KPMG's scope of services provided to Metro did not require KPMG to determine if these were voided checks and if the vendors actually got paid. (McDoniel Depo. p. 33, Ex 8). This was despite the fact that KPMG is one of the big four accounting firms. (February 6, 2003 hearing, p. 10).

6.      Typical testimony from Mr. Sullivan with regard to all the checks can be illustrated by his testimony with regard to the Monumental Life Insurance Company check, the

UNUM Life Insurance Company check, Prudential Life Insurance and Juvenile Court. For all of these checks, he testified that he had no idea whether or not these checks were mailed and whether or not these checks were properly voided on the system nor did he call any of these entities to inquire whether or not they received payment for these checks, because he was not requested to do so. He also testified that he had no knowledge of whether or not Ms. Crawford was following proper procedure if these checks were found in his office. (February 6, 2003 Hearing, p. 57).

For the MetLife check Sullivan did not speak with anyone at MetLife about the check, did not know whether Metro's policy was even to deposit the check, did not know if the check was even deposited by Metro after he found it, and did not know if Crawford was following proper procedure by not depositing the check. (Sullivan Depo., pp. 137-142, Ex. 31). Sullivan had no knowledge if the checks found were deposited by Metro or if the employees or vendors were paid, claiming that would be "well beyond the scope of our engagement". (Sullivan Depo., pp. 164-170, Ex 31). While Sullivan had the capability of investigating whether the vendors and employees on the 25 checks were paid or owed money, he did not do so was beyond the scope of the investigation. (Sullivan Depo., pp. 185-186, Ex 31).

7.     In the February 6, 2003 termination hearing Mr Bohenstiel, Plaintiff's supervisor, testified that no one had ever complained to him about any of the checks listed in the charge letter.  (Dec. 12, 2002 Hearing, pp. 29-43, Ex. 10). He also testified that voided checks should be saved. (Dec. 12, 2002 Hearing, pp. 29, Ex. 10).

8.     Metro had no written policy with regard to voided checks. (Feb. 6, 2003 Hearing, pp. 40-41, Ex 11) (Crawford Aff., ¶ 21, Ex. 1). Plaintiff testified that policy required her to keep the voided checks in her office. (Crawford Aff. ¶ 29, Ex 1).

9.     Plaintiff testified that her office was organized. She knew where everything was in her office. She kept voided checks in her office because this was the procedure used at Metro. Plaintiff was never disciplined, reprimanded or counseled by any of her supervisors about the condition of her office. Plaintiff worked as the payroll coordinator in the same office for thirty years. Her office remained the same for this thirty year time period. For over thirty years of her employment, none of her supervisors ever complained about the condition of her office. In fact, throughout the course of her employment, she received above average to excellent evaluations. (Crawford Aff. ¶ 29, Ex. 1).

10.     Plaintiff would state that after discovery has been completed, it has been determined that a majority of the checks found were voided checks. Additionally, Ms. Crawford was fired for failure to deposit the MetLife check when even one year after her termination Metro still had not deposited that check. MetLife had to reissue the check and then rather then Metro depositing the check, Metro finally got the proper paperwork to MetLife and Metro has never deposited that check. (Crawford Aff., ¶ 24, Ex. 1) (Cardwell Depo., pp. 32-33, Ex. 13).

11.     At the time of the KPMG investigation, Defendant was implementing a new system FastNet which even Sullivan acknowledged would solve some of the problems. (Sullivan

Depo., p. 90, Ex 31). Sullivan agreed FastNet would make things work better. (Sullivan Depo., p. 105, Ex 31).

12. Plaintiff was terminated for problems in the payroll department, while no other employee was counseled, disciplined or reprimanded and the defendant did not investigate which employee was the one responsible for the check but placed all responsibility on the Plaintiff as the supervisor. (McDoniel Depo. p. 50, Ex 8).

13. While Defendant claims KPMG found Plaintiff's office to be a mess, KPMG made no photographs or videotapes of the Plaintiff's office, despite the fact that Sullivan, an ex-DEA investigator, understood the importance of documenting a scene to make his case stand up in court and so that a jury would get a picture of what was occurring. (Sullivan Depo., pp. 145, 215-216, Ex 31).

14. On December 2, 2002, KPMG recommended that Metro perform certain tasks to improve the payroll department at the cost of $50,000-$150,000.00. Metro did not bother to do this. (Sullivan Depo., pp. 179-181, Ex 31) (Ex. 32).

As set forth in the previous section, Plaintiff would state Defendant's reason has no basis in fact. Plaintiff can further show Defendant was not truly motivated by its stated reasons and that these stated reasons were insufficient based on the following:

1. The three individuals who told Frazier of Hughes' sexual harassment were immediately investigated by Hughes and all three promptly discharged. Williams was waiting in Sadler's office to fire her when Sadler returned from Garcia's office after having picked up the fact finding report. (Sadler Aff., ¶¶ 10-11, Ex.18). Proffitt's position was eliminated four days after she was interviewed by Frazier.[11] (Proffitt Aff., ¶¶ 13, 20, Ex.19). Plaintiff was placed on administrative leave on November 7, 2002, and fired on January 6, 2003, after having been accused of embezzlement and drug use and later of questionable financial procedure. (Crawford Aff., ¶¶ 11-13, Ex. 1).

2. On the same date that the fact finding report was sent out by Veronica Frazier, September 13, 2002, basically clearing Hughes, Frazier sent a letter to the internal audit department requesting that an investigation be conducted into serious allegations about the Plaintiff's department, the payroll department. (Ex. 28).

3. Defendant allowed the subject of the sexual harassment investigation, Hughes, to bring allegations against the Plaintiff and the KPMG notes even provide that Gene Hughes came

---

[11] Dianne B. Proffitt has also sued this Defendant for retaliation and this matter was assigned to Judge Trauger (Docket No's 3:03-0587 and 3:03-1167) Judge Trauger granted the Defendant's Motion for summary Judgment based upon her finding that the decision maker in the Proffitt matter, Dr. Julie Williams, had no knowledge of the protected activity. While this matter was lost at the Sixth Circuit level, the Sixth Circuit has since decided *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516 (6th Cir. 2008) and it would be expected because of the short four day time period between Proffitt's engaging in a protected activity and her termination the ruling would be different.

into the audit room with KPMG Mark and stated "look at payroll". (Sullivan Depo. Ex. 10) (Ex. 31) (Hughes Depo., pp. 122-123).

4.    When KPMG got to Nashville, Hughes presented his "Payroll Concerns" which is a three page document which listed almost every area of the Plaintiff's job to be investigated and written at the top of the page is a notation that "Vicki Crawford has access". This document even questions Plaintiff's boyfriend and whether he has a forged signature on his W-4. (Sullivan Depo. Ex. 2) (Ex. 31).

5.    Hughes "Payroll Concerns" make allegations against all three women who complained of Hughes conduct, Sadler, Proffitt and Crawford. (Sullivan Depo. Ex. 2) (Ex. 31).

6.    The complaints against Plaintiff continually changed. The initial allegations concerned "mostly poor management of garnishments, sloppy timekeeping". (Ex. 22). Hughes made the auditors aware of these allegations. (Hughes Depo., pp. 122-123, Ex. 7) (McDoniel Depo., pp. 5, 22, 24, Ex. 8). On October 23, 2002, Hughes made allegations "now alleging misappropriation of funds". (Ex. 22). While, the charge letter accuses Plaintiff of mishandling certain checks, which Plaintiff claimed were voided checks. (Crawford Aff., ¶¶ 24-25, Ex. 1), Now, KPMG only can accuse Plaintiff of wrongdoing in general terms. (See Defendant's Brief).

7.    When KPMG arrived they investigated three employees, Crawford, Proffitt, and Sadler, the exact three who had testified against Hughes. (Frazier Depo., pp. 68-69, Ex. 3).

8.    While the three employees who told of Hughes sexual harassment were investigated and fired no on bothered to investigate Hughes and if he had been investigated it would have shown he lost his teaching certificate permanently in Florida for sexual harassment of at least four female employees and theft. This alone should have made him ineligible to head up the department of the Metropolitan Public School System responsible for employee relations. (Broward County Documents showing Hughes Educator's Certificate being permanently revoked, Ex. 15).

9.    Despite no evidence of embezzlement, Metro still told the press Plaintiff was being investigated for embezzlement when she was not. The KPMG investigation occurred the last week of October and the first two weeks of November, 2002 (Defendant's Statement of Material Facts No. 10) and the KPMG investigator denied investigating any allegations of embezzlement (Sullivan Depo., pp. 22, 163, 189-190, Ex. 31) and testified that no one from KPMG had ever indicated that they had found any evidence of embezzlement linked to Vicky Crawford. (Sullivan Depo., p. 23, Ex. 31). Sullivan further denied KPMG discovering any issue of drug use with Vicky Crawford. (Sullivan Depo., p. 23, Ex. 31). Yet on November 9, 2002, Defendant released to the Tennessean that Plaintiff was placed on administrative leave from her job while Metro investigated whether or not Plaintiff had embezzled money from the district. (Newspaper articles, Ex. 30). Dr. Pedro Garcia told the board members he would not identify the woman or the amount of money involved. Dr. Pedro Garcia added that the officials have yet to determine if the alleged embezzlement is related to drug use. (Crawford Aff., ¶ 12, 14, Ex. 1).

Thereafter on November 23, 2002, well after the KPMG investigation had concluded and no evidence of embezzlement was found, Metro still told the Tennessean that it was meeting to determine if charges of embezzlement should be brought and identified the employee as Vicky S. Crawford. (Newspaper Articles, Ex. 30). Sullivan denies ever meeting to discuss whether embezzlement charges should be brought. (Sullivan Depo., p. 190, Ex. 31).

10.     Defendant claims Henson had no knowledge that Plaintiff engaged in protected activity and this is clearly incorrect. On December 12, 2002, a hearing was held with regard to the Plaintiff's termination. In that hearing, Ms. Crawford's counsel told Chris Henson that Ms. Crawford testified against Hughes sexual harassment of her and that Metro rather than firing Gene Hughes walked in and fired the women who complained about Gene Hughes. Chris Henson was told that the charges against Ms. Crawford were trumped in retaliation. Additionally, Chris Henson was provided a copy of the sexual harassment investigation fact finding report. (Crawford Aff., ¶ 18, Ex. 1); (Dec 12, 2002 Hearing, pp. 6-15, Ex. 10).  This blatant misrepresentation   is evidence of pretext.

11.     The Defendant left out of the Fact Finding Report that the initial complaint came from Bozeman, an attorney with Metro Legal. Plaintiff would state this was done to protect Bozeman from retaliation. The KPMG notes indicate that the original complaint of Hughes sexual harassment came from Bozeman, an attorney with Metro legal. These notes state as follows:

Veronica Frazier told the KPMG investigator the following:

Veronica Frazier        10/30/2002
1.      Jennifer Bozman had received a questionable Email ("Positions")
3.      Felt that she had to do something – Brought it up to HR (Veronica)
2.      Discussion w/ Tamara Sadler who mentioned Gene's behavior.
(Sullivan Depo. Ex. 9) (Ex. 31) (Ex. 4).

While these notes provide Frazier informed the KPMG investigator of Hughes sexual harassment of Bozeman on October 30, 2002, no mention is made in her circulated fact finding report dated September 13, 2002 of this harassment of Bozeman and she denied any harassment of Bozeman by Hughes in her deposition. Both Bozeman and Frazier denied in their deposition testimony Hughes harassed Bozeman. Bozeman did not reveal the existence of this e-mail in her deposition and denied any inappropriate remarks from Hughes. (Bozeman Depo., p. 9, Line 16 – p. 12, line 1, Ex. 4).

Jennifer Bozeman testified that Tamara Sadler was the one who initiated the conversation about Gene Hughes and told of his sexual harassment. (Bozeman Depo., p. 15, line 25 - p. 17, line 10, Ex. 4). Likewise, Frazier denied Bozeman had any complaints of Hughes (Frazier Depo., p. 49, line 18 – p. 50, line 1, Ex. 5). (Frazier Depo., p. 61, line 23 – p. 62, line 11, Ex. 5). Plaintiff would state Bozeman's name was left out as a complaining party because Metro Legal knew of the propensity of Hughes and Garcia to retaliate and it was protecting its own. Hence, Bozeman kept her job while the three listed in the report did not.

Hence, Plaintiff has proof that Defendant's stated reason for firing her is false. All Defendant can accuse Plaintiff of is having checks in her office, which should have been there as they were voided checks. Defendant has not offered any proof that any vendor or employee was not paid, nor can it, because these were merely voided checks. Plaintiff's office processed 1,000 vendor and 25,000 employee checks per month. It should be expected that checks would be in her office. Metro used KPMG to cover up its retaliatory actions against Plaintiff. Hence, both Hughes and Metro accused Plaintiff of embezzlement and drug use, despite KPMG denying such. And when KPMG found checks in Plaintiff's office, Metro intentionally requested KPMG not to investigate to see if these 25 checks were in reality voided checks and requested that KPMG not put its findings in writing.

## CONCLUSION

Plaintiff respectfully requests that the Defendant's Motion for Summary Judgment be denied in its entirety.

Respectfully Submitted:

**s/Ann Buntin Steiner**
Ann Buntin Steiner,    #11697
Attorney for Plaintiff
Steiner & Steiner
613 Woodland Street
Nashville, TN 37206
(615) 244-5063

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2009, a copy of the Plaintiffs' Brief and Memorandum of Law in Opposition to the Defendant's Motion for Summary Judgment was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt as follows: Kevin Klein, The Dept. of Law of the Metropolitan Government of Nashville and Davidson County, P.O. Box 196300, Nashville, TN 37219-6300. Parties may access this filing through the Court's electronic filing system.

**s/Ann Buntin Steiner**
**Ann Buntin Steiner, BPR #11697**
The Law Offices of Steiner & Steiner
613 Woodland Street
Nashville, TN 37206
(615) 244-5063